# In the United States Court of Federal Claims

No. 14-864C

(Filed Under Seal: November 7, 2014 | Reissued: November 25, 2014)

|  |  |  |
|---|---|---|
| IBM CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Post-Award Bid Protest; Motion for |
| v. | ) | Judgment on the Administrative Record; |
| | ) | Failure to Conform to Material |
| THE UNITED STATES OF AMERICA, | ) | Requirements of the Solicitation; FAR |
| | ) | Part 8 Versus FAR Part 15; FAR 1.102- |
| Defendant, | ) | 2; Fair and Impartial Treatment; |
| | ) | Organizational Conflict of Interest |
| and | ) | |
| | ) | |
| ERNST & YOUNG LLP, | ) | |
| | ) | |
| Defendant- | ) | |
| Intervenor. | ) | |

*Jason A. Carey*, with whom were *J. Hunter Bennett*, *John W. Sorrenti*, *Sandeep N. Nandivada*, and *Patrick J. Stanton*, McKenna Long & Aldridge LLP, Washington, D.C., for Plaintiff.

*Domenique G. Kirchner*, with whom were *Joyce R. Branda*, Acting Assistant Attorney General, *Robert E. Kirschman*, Jr., Director, and *Deborah A. Bynum*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

*John E. Jensen*, with whom were *Alvin Dunn*, *Alexander B. Ginsberg*, *Travis L. Mullaney*, and *Meghan D. Doherty*, Pillsbury Winthrop Shaw Pittman LLP, McLean, V.A., for Defendant-Intervenor.

# OPINION AND ORDER[*]

**KAPLAN, Judge.**

Plaintiff IBM Corporation ("IBM") is the incumbent contractor providing audit readiness services for the Department of the Army ("the Army" or "the agency") in support of the Army's effort to produce auditable financial statements by September 2017.  In this post-award bid protest, IBM challenges the Army's award of a contract for similar services to defendant-intervenor Ernst & Young LLP ("EY").

Currently before the Court are IBM's motion for judgment on the administrative record and the government's and EY's cross motions for judgment on the administrative record.  For the reasons set forth below, IBM's motion is **DENIED**, and defendant's and intervenor's cross motions are **GRANTED**.

## BACKGROUND

### I.      The Solicitation

On September 30, 2013, the Army issued Request for Proposals No. W91CRB-13-R-0034 ("solicitation" or "RFP") for a time-and-materials ("T&M") contract.  <u>See</u> Corrected Admin. R. ("CAR") 51, 260-64.  The procurement was open to entities that held a General

---

[*]      This Opinion was originally issued under seal.  Pursuant to this Court's September 19, 2014 Protective Order, ECF No. 15, the parties were given the opportunity to request redactions. In a joint submission, filed November 21, 2014, the intervenor, Ernst & Young LLP ("EY"), requested redactions for several categories of information.  One category consists of references to an EY employee by name.  Two other categories consist of direct quotes from EY's technical proposal whose disclosure EY contends would cause it competitive harm by allowing competitors to use EY's approach themselves in drafting the language of their proposals.  The final category of information concerns EY's proposal to ensure a smooth transition by offering a subcontract to IBM and employment to IBM's employees.  EY argues that it will be harmed if this proposal is revealed, because EY's competitors might decide to use this strategy in future competitions, thus disadvantaging EY.

The Protective Order defines "protected information" as "information that must be protected to safeguard the competitive process, including source selection information, proprietary information, and confidential information."  Beyond this, the Court must weigh any proposed redaction against a "presumption of public access to judicial records."  <u>Baystate Techs., Inc. v. Bowers</u>, 283 F. App'x 808, 810 (Fed.Cir.2008) (per curiam) (citing <u>Siedle v. Putnam Invs., Inc.</u>, 147 F.3d 7, 9 (1st Cir.1998); <u>Poliquin v. Garden Way, Inc.</u>, 989 F.2d 527, 533 (1st Cir.1993)).  In light of this presumption, the Court accepts the parties' proposed redactions of information identifying particular individuals, and these redactions are indicated by brackets. The Court, however, is not persuaded by EY's rather conclusory assertions that redacting the other information quoted from its proposal is necessary to safeguard the competitive process. Moreover, publishing this information without redaction would serve the public interest because such information, particularly the discussion of EY's proposal to offer a subcontract to IBM, is crucial to any reader's understanding of the Court's reasoning in the case.

Services Administration ("GSA") Financial and Business Solutions ("FABS") Schedule contract. See CAR 294. Therefore, it was governed by Part 8 of the Federal Acquisition Regulation ("FAR").[1] The purpose of the contract was to assist the Army in achieving auditability with respect to four General Fund annual financial statements by September 2017, as directed by the Department of Defense ("DoD").[2] CAR 265. Auditability was to be achieved "through improvements in the supporting financial systems, Army financial management processes, effective internal controls and supporting documentation." CAR 265. According to the RFP, the Army's efforts to meet the September 2017 deadline would involve "one of the most complex and challenging transformations ever attempted." CAR 265. The contract would include a one-year base period and two one-year options. See CAR 260-64, 271. By March 5, 2014, the final date on which offers were due, the RFP had been amended eight times. See CAR 116-257.

The RFP provided that the Army would award the contract "to the Offeror who gives the Government the greatest confidence that it will best meet or exceed the requirements," using a best-value tradeoff approach. CAR 296. The RFP identified seven factors for evaluation: (1) Experience, (2) Approach to Sample Scenario, (3) Past Performance, (4) Key Personnel, (5) Transition Plan, (6) Small Business Utilization Factor, and (7) Price. CAR 296.

The best value tradeoff required weighing Factors 1 and 2 against Factor 7 (Price). CAR 296. Factors 1 and 2 were equally important and, when combined, were more important than Price. CAR 296. Factors 3 through 6 were to be evaluated on a pass/fail basis only and would not play a role in the best value analysis. CAR 296. An offeror who received a rating of "unacceptable" for any of the six non-price factors was not eligible for award. CAR 296.

According to the solicitation, offerors' total evaluated prices consisted of their prices for (1) the Labor contract line item numbers ("CLIN") X00l and (2) the other direct costs ("ODC") CLINs X002 (which all offerors were required to price at $400,000 per CLIN, see CAR 260, 262, 264). CAR 294. As required by FAR 16.601(d)(2), the RFP set a limit on the contractor's level of effort under the T&M Labor CLINs in section 2.1.4 in the Performance Work Statement ("PWS"). CAR 271. The provision stated,

> The Contractor level of effort to complete deliverables under this contract shall not exceed the following:

---

[1] The FAR is codified at Title 48 of the Code of Federal Regulations.

[2] Federal agencies are required by law to produce annual audited financial statements. See Chief Financial Officers Act of 1990, Pub. L. 101-576, 104 Stat. 2838 (1990); Government Management Reform Act of 1994, Pub. L. 103-412, 108 Stat. 285 (1994); National Defense Authorization Act of 2012, Pub. L. 112-81, 125 Stat. 1298 (2011). DoD's effort to bring itself into compliance with these requirements by September 2017 is known as "FIAR," which stands for "financial improvement and audit readiness."

| Labor Category | Base Period Hours (CLIN 0001) | Option Period 1 Hours (CLIN 1001) | Option Period 2 Hours (CLIN 2001) |
|---|---|---|---|
| Director | 1242 | 1117 | 950 |
| Senior Manager I | 23549 | 21194 | 18015 |
| Manager I | 87339 | 78605 | 66814 |
| Senior Consultant I | 111715 | 100543 | 85462 |
| Consultant I | 91117 | 82005 | 69705 |
| Research Assistant | 93015 | 83713 | 71156 |

CAR 271.  Offerors were instructed to propose rates per labor category based on their current GSA rates, and they were encouraged to offer discounts on those rates.  CAR 271.  Offerors' prices for Labor CLINS, then, amounted simply to their proposed rates multiplied by the number of hours specified in PWS 2.1.4.  CAR 271.

During the procurement, some offerors asked the Army about the extent to which PWS 2.1.4 permitted a successful offeror to reallocate hours among the labor categories.  See, e.g., CAR 2052, 2057, 2059, 2065.  These questions and the Army's answers were compiled into a document (the "Q&As") that was attached to the solicitation and to various solicitation amendments.  In Q&A 136, one offeror asked, "Will the successful offeror have flexibility to reallocate the hours among labor categories during project execution, as long as we do not exceed the ceiling?"  CAR 2065.  The Army responded, "As approved by the [Contracting Officer's Representative ("COR")], the successful offeror will have the flexibility to reallocate hours as long as the ceiling is not exceeded."  CAR 2065.

## II.      Proposals, Evaluation, and Award

Three offerors submitted proposals, including IBM and EY.  For Factor 1, the Technical Evaluation Team rated both IBM and EY as "outstanding."  CAR 1036, 1048.  For Factor 2, it rated IBM as "outstanding" and EY as "acceptable."  CAR 1041, 1053.  For all other non-price factors, both IBM and EY received "acceptable" ratings.  See CAR 1107.

A significant difference between IBM and EY was in their labor rates, which ultimately resulted in a substantial disparity between their total evaluated prices.  Compare CAR 529-30 with CAR 961.  Thus, IBM's total evaluated price was $85,986,434, while EY's total evaluated price was $55,553,597.  CAR 1150.  Regarding this price differential, the Source Selection Authority ("SSA") noted that EY heavily discounted its GSA rates per labor category and found no indication of mistake in EY's pricing.  CAR 1151.

Both IBM's proposal and EY's proposal included language concerning the extent to which hours might be reallocated among the labor categories set forth in PWS 2.1.4.  IBM's proposal stated as follows:

> In completing RFP Pricing Table, Attachment 3, IBM has used the Government provided hours by labor category and applied our proposed fixed hourly rates.  In performance of the contract there is a need for flexibility in the labor mix to effectively support this work.  In accordance with RFQ Question and Answer number 136, with COR approval, we have the flexibility to reallocate hours by

4

labor categories within the overall task order value without a contract modification.

CAR 529.

Similarly, under the heading "Administrative Items," EY included the following language:

> Team EY reserves the right to reallocate hours between labor categories during the performance of this engagement to perform the services required, provided the reallocation does not result in exceeding the ceiling price established in the contract.

CAR 972.  In the same section of the proposal, EY also stated,

> Team EY reserves the right to use additional labor categories offered under our FABS Federal Supply Service Schedule contract # GS-23F-8152H, at hourly rates mutually agreeable to the parties depending on the requirements of the project.

CAR 972.

Before rendering an award decision, the Army contacted each offeror "seeking clarifications relating [to] their ethics policies and information to understand any potential [organizational conflicts of interest ("OCIs")]." CAR 1075. When contacting EY, the Army's Contracting Officer specifically inquired about the role, if any, that [          ], an EY employee, had played in preparing EY's proposal. CAR 1075. The Army posed this specific question because until March 2013, [          ] had served as Director of Financial Improvement and Audit Readiness ("FIAR Director") in the Office of the Undersecretary of Defense-Comptroller ("OUSD(C)"). See CAR 1066, 1075. EY responded that [          ] did, in fact, have a role in preparing EY's proposal.  CAR 1073.

Thereafter, the contracting officer secured a copy of an opinion concerning post-employment activities that DoD ethics officials had provided to [          ] prior to [   ] retirement from DoD. See CAR 1066-72. The opinion letter discussed the tasks [          ] had performed as a program manager in connection with a 2011 BPA for Audit Readiness for the OUSD(C), observing (1) that [   ] duties included the development of the Statement of Work and Independent Government Cost Estimate and assisting the Contracting Officer in determining the contract type and evaluation team members and (2) that [   ] was not the COR or the SSA on the six BPAs that were awarded.  CAR 1067.

Based on the opinion, the Contracting Officer found that [          ] "had acted as a program manager during the pre-award stages of a BPA issued in 2011 for similar work at the DoD level." CAR 1073. She stated that "while [   ] may have received access to proprietary information relating to EY's competitors relating to that acquisition, I do not find that this provided EY with any competitive advantage." CAR 1073. Specifically, she explained that "[i]t would only be speculation that [          ] accessed proprietary information of the competitors,"

and that even if [   ] had accessed such information, the information was now three years old and therefore stale.  CAR 1073.  She also stated that "[      ] had no insight into this specific requirement, the way this requirement would be evaluated for pricing, or the way in which the competitors of EY would base their proposals and discounts."  CAR 1073.

The Army concluded that the additional strengths provided by IBM did not warrant paying a premium of $30,432,837 (or 54.8%).  CAR 1153.  Accordingly, on May 20, 2014 it awarded the new audit-support contract to EY.  CAR 1153.

## III.     The Final Contract

On May 22, EY and the Army executed the final version of the contract.  See CAR 1195. The final version of the body of the contract tracked the language in PWS 2.1.4 exactly as it appeared in the solicitation.  CAR 1211.  That final version differed, however, from an earlier draft of the contract in which the language of Q&A 136 (providing that "[a]s approved by the COR, the Contractor will have the flexibility to reallocate hours as long as the ceiling is not exceeded") was included as part of PWS 2.1.4.  CAR 1172.[3]

While the final version of the contract did not deviate at all from the language of PWS 2.1.4, the parties dispute whether certain language contained on the Standard Form ("SF") 1449[4] (which served as the cover page for the contract, CAR 1195) was intended to incorporate by reference the language contained in EY's "Administrative Items" regarding the reservation of rights to reallocate hours and add labor categories.  Pl.'s Opp'n to Def.'s & Intervenor's Mot. for J. on Admin. R. ("Pl.'s MJAR Resp.") 10-12, ECF No. 50; Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. & Def.'s Cross Mot. for J. on Admin. R. 20-22, ECF No. 24; Def.-Intervenor's Opp'n to Pl.'s Mot. for Prelim. Inj. 5-7, ECF No. 32.  Specifically, as explained further below, an X was

---

[3] According to an affidavit submitted to GAO and executed by Gregory Wagencknecht, Contracting Officer, the Army initially included the language of the Q&A in the contract but then removed it after Mr. Wagenknecht and the prior Contracting Officer on the solicitation consulted with an attorney advisor.  CAR 1667.  Mr. Wagenknecht and the prior Contracting Officer apparently had a disagreement about how to interpret the word "ceiling" as it was used in Q&A 136.  CAR 1667.  Upon consulting with counsel, Mr. Wagenknecht explained, he "realized that the inclusion of the language may have created an inconsistency and therefore was removed prior to contract execution."  CAR 1667.  Specifically, Mr. Wagenknecht stated, in order to consistently read Q&A 136 and PWS 2.1.4, "[t]he interpretation is that hours can be reallocated between labor categories, provided the hours per labor category do not exceed those stated in PWS paragraph 2.1.4 (which is consistent with the response to Q&A #136 and E&Y's condition of their proposal)."  CAR 1667.

[4] SF 1449 is prescribed by FAR 12.303 for use with contracts for commercial items.

placed in the checkbox for Item 28 on the SF 1449.  CAR 1195.[5]  That item contains a blank space where the agency is to indicate the number of copies of the contract that the contractor must sign and return.[6]  CAR 1195.  The form language contained in the SF 1449 for item 28 provides that "Contractor agrees to furnish and deliver all items set forth or otherwise identified above and on any additional sheets subject to the terms and conditions specified herein."  CAR 1195.  In this case, the notation "REF: EY Proposal" was inserted into Item 28, under this statement and below the checkbox.  CAR 1195.

SF 1449 also contains a checkbox for Item 29.  CAR 1195.[7]  Item 29 contains language stating "Award of Contract: Reference."  CAR 1195.  It provides a blank space to fill in the date of the offer.  CAR 1195.  It also contains a blank space for an agency to list contract provisions it accepts after a sentence stating that "your offer on solicitation [reference number] including any additions or changes which are set forth herein, is accepted as to items:"  CAR 1195.  Although no X was placed in the Item 29 checkbox, the Army filled in the blank with the date of EY's offer (March 5, 2014) and inserted "see schedule" in the space where the agency lists the items being accepted.  CAR 1195.

## IV.   GAO Protest

On June 2, 2014, IBM protested the award at the Government Accountability Office ("GAO"), and the Army issued a stop-work order to EY.  See CAR 1551-1629.  To avoid an interruption in services during the pendency of the protest, the Army negotiated a bridge contract with IBM, which expires on November 9, 2014.  Steffens Decl. ¶ 6, ECF No. 14, Sept. 19, 2014.

GAO denied the protest on September 5, 2014.  See PricewaterhouseCoopers LLP, B-409885 et al. (Comp. Gen. Sept. 5, 2014) ("GAO Decision"); CAR 1777-99.  Shortly thereafter, on September 10, 2014, EY resumed transition work under the contract.  CAR 1800.

## V.   IBM's Protest in This Court

On September 17, 2014, IBM filed a bid protest complaint in this court, along with a motion for a temporary restraining order and/or a preliminary injunction.  Shortly thereafter, EY filed a motion to intervene in the case, which the Court granted by Order of September 18, 2014.

In its complaint and its briefs, IBM asserts three grounds for its protest: (1) as a matter of law, EY was ineligible for a contract award because language in its proposal that purported to

---

[5] Items 28 and 29 as they appeared on the SF 1449 in this case are reproduced below:



[7] See also note 5, supra.

reserve a right to reallocate labor hours and to employ new labor categories conflicted with a material term of the solicitation (PWS 2.1.4) (see Pl's Mem. in Supp. Mot. TRO & Prelim. Inj. ("Pl.'s PI Mem.") 21-29, ECF No. 4);[8] (2) the Contracting Officer did not conduct an adequate investigation of the potential OCI raised by [      ]'s involvement in the drafting of EY's proposal (see Pl.'s PI Mem. 29-33; Pl.'s MJAR Resp.); and (3) the Army's evaluation of EY's transition plan was irrational (see Pl.'s PI Mem. 34-38; Pl.'s MJAR Resp. 19-21).

On September 19, 2014, the Court denied IBM's motion for a temporary restraining order ("TRO") and set an expedited briefing and oral argument schedule for consideration of IBM's motion for a preliminary injunction.  Order, ECF No. 16.  After full briefing and argument, on October 3, 2014, the Court denied plaintiff's motion for a preliminary injunction, based on its conclusion that IBM had failed to show that it would suffer irreparable harm if preliminary relief was not granted or that the balance of hardships tipped in its favor.  Opinion & Order, ECF No. 49.

The case is now before the Court on cross-motions for judgment on the administrative record.  For the reasons set forth below, the Court concludes that IBM has not demonstrated that the contract award was arbitrary and capricious or contrary to law.  Accordingly, it **GRANTS** judgment on the administrative record for the government and the intervenor.

## DISCUSSION

## I.      Jurisdiction

The Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012).  A party is an "interested party" with standing to bring suit under 28 U.S.C. § 1491(b)(1) if the party "is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract."  Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013).  A bidder has a direct economic interest if it suffered a competitive injury or prejudice.  Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing").

In a post-award bid protest, the protestor has suffered prejudice if it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  See also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009); Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006).  "In other words, the protestor's chance of securing the award must not have been insubstantial."  Info. Tech., 316 F.3d at 1319.

---

[8] After denying IBM's motion for a preliminary injunction, the Court treated Plaintiff's Memorandum in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction as IBM's brief in support of a motion for judgment on the administrative record. Opinion & Order, Oct. 3, 2014, ECF No. 49, at 12.

Neither the government nor EY disputes that IBM is an "interested party" within the meaning of the statute. IBM was an actual offeror for the contract in question. Further, IBM is the incumbent contractor, offered the second-lowest price, and received slightly higher technical ratings than the awardee. Because IBM's chance of securing the award upon a ruling that the award to EY was invalid and the consequent re-evaluation of the offerors' proposals would not be "insubstantial" (Info. Tech., 316 F.3d at 1319), the jurisdictional requirement that IBM establish its standing has been met.

## II.      Standard for Granting Judgment on the Administrative Record

Pursuant to RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1354 (Fed. Cir. 2005). The Court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

## III.     Standard of Review in Bid Protest Cases

The court reviews challenges to a contract award under the same standards used to evaluate agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2012). See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). To successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Bannum, Inc., 404 F.3d at 1351. "The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).

In a bid protest, the disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1338 (Fed. Cir. 2001). Indeed, such a challenge can succeed only where the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Ala. Aircraft Indus., Inc.–Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co. ("State Farm"), 463 U.S. 29, 43 (1983)).

Given this highly deferential standard of review, the court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa, 238 F.3d at 1332-33 (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)).  The agency need only articulate a "rational connection between the facts found and the choice made," and the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  State Farm, 463 U.S. at 43.

## IV.   Merits

### A.  Count I of IBM's Complaint Lacks Merit.

As stated above, IBM contends that EY's proposal, specifically the language in its "Administrative Items" section purporting to reserve to EY "rights" to reallocate labor hours and to create new labor categories, conflicted with PWS 2.1.4.  See Pl.'s PI Mem. 24.  Because PWS 2.1.4 was a material term of the solicitation, IBM argues, the Army was required to find EY's proposal unacceptable and ineligible for a contract award.  Pl.'s PI Mem. 21-29.  Instead, IBM claims, the Army awarded EY a contract that incorporated the inconsistent provisions by reference.  Pl.'s PI Mem. 25-26.  Further, IBM argues, even assuming that EY's nonconforming language was not incorporated into the contract, the Army nonetheless violated FAR 1.102-2(c)(3) (establishing the requirement that all contractors must "be treated fairly and impartially") by in effect allowing EY, but not IBM or any other offeror, the opportunity to revise its proposal.  Pl.'s MJAR Resp. 5-12.

For the reasons set forth in greater detail below, the Court finds these contentions unpersuasive because: (1) the contract did not incorporate by reference the language in EY's proposal that IBM finds objectionable; (2) the Army did not give EY the opportunity to revise its proposal, but, rather, it reasonably concluded that the proposal was not inconsistent with the RFP; and (3) in any event, even if the Army had allowed EY to clarify and/or revise its proposal to conform to the solicitation, doing so did not violate the FAR requirement of fair treatment for all offerors.

### 1.  The Army did not unfairly relax any requirements for EY because the final contract conforms to the solicitation.

As noted, IBM contends that the Army unlawfully relaxed the solicitation's staffing requirements when it accepted and then allegedly incorporated into the final contract EY's proposal containing the reservation-of-right language.  The Court finds, however, that EY's proposal—and particularly the reservation-of-right language—was not incorporated into the contract, causing this line of IBM's argument to collapse.

Although no particular "magic words" are required, Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1346 (Fed. Cir. 2008), "[t]o incorporate extrinsic material, a contract must use language that leaves no relevant 'ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract.'"  Lakeshore Eng'g Servs., Inc. v. United States, 748 F.3d 1341,

1347 (Fed. Cir. 2014) (quoting <u>Northrop Grumman</u>, 535 F.3d at 1344); <u>see also</u> <u>Precision Pine & Timber, Inc. v. United States</u>, 596 F.3d 817, 826 (Fed. Cir. 2010) ("To incorporate material by reference, a contract must use clear and express language of incorporation, which unambiguously communicates that the purpose is to incorporate the referenced material, rather than merely acknowledge that the referenced material is relevant to the contract.").

No such "clear and express language" that "unambiguously communicates" an intent to incorporate EY's proposal exists here. On its face, the contract virtually mirrors the solicitation. For example, and most importantly, the contract includes PWS 2.1.4 verbatim and includes the language stating that "[t]he contractor level of effort to complete deliverables under this contract shall not exceed [the number of hours set forth for each labor category]." CAR 1211. This language is set forth without exceptions, conditions, qualifications, or reservations of right. CAR 1211. Moreover, the contract lists the labor categories that were specified in the solicitation—no more and no fewer—and EY's corresponding hourly rate for each category. CAR 1219-20. In addition, Section J of the contract lists individual documents that became part of the contract, including particular portions of EY's proposal. CAR 1229. Notably absent from this list is any document containing the reservation-of-right language. Thus, the contract contains no indication—much less a clear, express, or unambiguous one—of any intent to incorporate EY's proposal in its entirety or on a more limited basis with respect to the contested "Administrative Items" provisions.

In arguing nonetheless that the contract incorporated the entirety of EY's proposal, IBM relies upon the insertion of the phrase "REF: EY Proposal" in Item 28 of SF 1449 and the addition of the date of EY's proposal in Item 29. According to IBM, "[t]he only reasonable reading of ["REF: EY Proposal"] is that it . . . . incorporated the **entire** proposal." Pl.'s Reply in Supp. of Mot. for Prelim. Inj. ("Pl.'s PI Reply") 10, ECF No. 41 (emphasis in original). And further, IBM argues, the insertion of the date of EY's proposal in Box 29 "strongly suggest[s] that the parties intended" to incorporate EY's entire proposal. <u>Id.</u> at 10 n.4.

As is readily apparent, the notations on the SF 1449 do not provide the requisite clear, express, or unambiguous evidence of an intent to incorporate the terms of EY's proposal into the contract. <u>See</u> <u>Precision Pine</u>, 596 F.3d at 826. In fact, the Court is not quite sure what to make of the fact that the box for Item 28 was checked or the fact that the phrase "REF: EY Proposal" was inserted in Item 28 given that, as counsel for IBM has observed, Item 28 itself is applicable where a solicitation, not a contract, is being prepared.[9] It is Item 29 that is apparently used in connection with a contract award to indicate which parts of a proposal have been incorporated into a contract. Pl.'s Notice Ex. A at 4. But while Item 29 contains the date of the EY proposal, it is not checked at all.

---

[9] At the oral argument on the cross motions for judgment on the administrative record, IBM referenced the instructions generally attached to the SF 1449 as well as the "Solicitation Preparation Guide for the Acquisition of Commercial Items by DoD." <u>See</u> Pl.'s Notice of Filing Exs. ("Pl.'s Notice"), ECF No. 55, Oct. 16, 2014. Specifically, IBM noted the instructions for Box 28, which direct the Contracting Officer to check the box if using the form to prepare a solicitation. <u>Id.</u> Ex. A at 4.

In any event, the Court must read the contract as a whole, construe individual provisions in the context of the entire contract, and avoid interpretations that make any provision superfluous or redundant. Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir. 2014); Pac. Gas & Elec. Co. v. United States, 536 F.3d 1282, 1288 (Fed. Cir. 2008); Medlin Const. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006). Therefore, the Court must read the notations on the SF 1449 in light of, for example, Section J, which lists as attachments only selected portions of EY's proposal. If IBM were correct that EY's proposal was incorporated into the contract wholesale, the incorporation of these specific portions of EY's proposal in Section J would be redundant. As well-established principles of contract interpretation instruct, such a construction is disfavored. See Medlin Const. Grp., 449 F.3d at 1200.

Because the contract does not incorporate EY's proposal—and, particularly, does not incorporate EY's reservation-of-right language—the contract holds EY to the exact requirements of the solicitation—and, particularly, to the requirements of PWS 2.1.4. Therefore, IBM's contention that the Army relaxed the requirements of PWS 2.1.4 for EY has no merit.

## 2. The Army did not permit EY to revise its proposal because it concluded that EY's proposal conformed to the solicitation.

IBM argues that if the contract did not incorporate EY's reservation-of-right language, then the Army must have, at least in effect, permitted EY to revise its proposal and remove that allegedly nonconforming language. According to IBM, allowing EY to revise its proposal but not providing a similar opportunity to IBM or any other offeror was unfair and violated procurement law and regulations. Pl.'s MJAR Resp. 5-10.

To begin with, the Court notes that the record contains no evidence that the Army allowed EY to revise its proposal. It contains only one EY proposal, submitted on the March 5, 2014 deadline for all offerors, as well as a draft contract and a revised, final contract. There is no revised EY proposal, and there is no evidence in the record to suggest that there were pre-award discussions between EY and the Army that led to a revision of the proposal. There is also no discussion in the source selection decision document ("SSDD") suggesting that the proposal needed to be revised to conform to the solicitation.

To the contrary, the record affirmatively indicates that the Army did not believe that EY's proposal was in need of revision because it did not read the reservation-of-right language contained in the "Administrative Items" section as nonconforming. Rather, the Army concluded that EY's proposal bound it to follow the maximums set forth in the solicitation. Specifically, the SSDD reflects that the Army reviewed the reasons that EY gave to explain its deeply discounted rates to "ensure that they were not the result of a mistake." CAR 1151. Yet nothing in that discussion suggests that EY's rate discounts were based on any expectation that it would be able to exceed the hours allocated to each labor category as specified in the PWS. See Pl.'s PI Mem. 27 (arguing that IBM could have discounted its labor rates more deeply, resulting in a $23 million reduction in price, if it had the flexibility to reallocate hours and exceed the contract maximums for particular labor categories). To the contrary, the SSA concluded that "there is no

reason to doubt the Army will reap the savings" from EY's "deeply discounted" rates, "considering . . . the contract maximums in place." CAR 1153.[10]

Further, the Army's finding that there was no conflict between the solicitation and the proposal was not arbitrary and capricious. See Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 507 (2009) (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996)) (observing that "[c]ourts will only overturn an agency's finding that a bid satisfied the material requirements of a solicitation if such a finding was arbitrary and capricious"). First, and most obviously, EY did not expressly take exception to PWS 2.1.4. Instead, it provided prices that were based explicitly on the labor categories and contract maximums set forth in the solicitation. CAR 962-63. Second, there is nothing on the face of the proposal that indicates that EY would not comply with the limitations set forth in PWS 2.1.4. See Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 (Fed. Cir. 2009) (observing that "a proposal that, on its face, leads 'an agency to the conclusion that an offeror could not and would not comply with [a limitation set forth in the solicitation]' is technically unacceptable and 'may not form the basis for an award.'" (quoting Chapman Law Firm v. United States, 63 Fed. Cl. 519, 527 (2005), aff'd 163 Fed. App'x 889 (Fed. Cir. 2006))). In fact, EY acknowledged the requirements of PWS 2.1.4 throughout its proposal. See, e.g., CAR 950 ("[EY's] experience and established tools and methodologies will allow us to deliver the PWS services in an efficient and effective manner."); see also id. ("Team EY has more than the required people requested by the Army ready to perform the engagement at the labor categories requested in the RFP.").

Further, principles of interpretation suggest that the Court should read the proposal as a whole in order to discern the meaning of any individual parts. Cf. Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1353, n.4 (Fed. Cir. 2004) (applying the principles of interpreting government contracts "with equal force" to solicitations, specifically the principle of "consider[ing] the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions"); Gen. Dynamics Corp. v. United States, 671 F.2d 474, 478 (Ct. Cl. 1982) ("Whenever possible, the terms of a contract must be read consistently with each other and so as to give them full effect."). In this case, reading the proposal as a whole, and given the other indications of EY's willingness to conform itself to the PWS

---

[10] As evidence that the Army recognized an inconsistency between EY's reservation-of-right language and PWS 2.1.4, IBM cites the addition, post award, of the language from Q&A 136 in the contract and the subsequent removal of that language. According to IBM, "these events . . . strongly suggest that the Army belatedly recognized the impact of E&Y's reservations of right." Pl.'s PI Mem. 26. The Court declines to draw this inference from the record. To the contrary, what little is in the record about this issue suggests that the discussions about the final contract language had to do with whether the language from Q&A 136 (and not the reservation-of-right language in the proposal) should be included in the contract. See CAR 1667. It also suggests that the decision not to include any additional reservation-of-right language was based on the conclusion that doing so could ultimately cause confusion. See CAR 1667. The language was thought to be unnecessary precisely because the Army concluded that Q&A 136 as well as EY's proposal language could be read as consistent with PWS 2.1.4 by reading all three as providing "that hours can be reallocated between labor categories, provided the hours per labor category do not exceed those set forth in PWS paragraph 2.1.4." CAR 1667.

contained in EY's proposal, it was reasonable for the Army to read the language contained in the "Administrative Items" section of the proposal as not inconsistent with the solicitation.

Thus, the Court notes that Q&A 136 is incorporated into the solicitation. See HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 239 (2012) (observing that, "in a substantial number of bid protests," Q&As amend or at least clarify a solicitation); BayFirst Solutions, LLC v. United States, 102 Fed. Cl. 677, 689 n.15 (2012) (same).  Given that context, the Army reasonably concluded that in reserving a "right" to reallocate hours "provided the reallocation does not result in exceeding the ceiling price established in the contract," EY did not intend to reserve to itself a unilateral right to exceed the hours set forth in the PWS for each labor category.  Instead, the Army reasonably read that language as an imperfect restatement of Q&A 136, which would allow the successful offeror—with the approval of the COR—to "have the flexibility to reallocate hours as long as the ceiling is not exceeded."  In other words, in referring to a "right to reallocate hours between labor categories," EY was referring to the "right" described in the Q&A.

Similarly, EY's reservation of a right to use additional labor categories was also not inconsistent with the solicitation.  Importantly, EY qualified that right to use additional labor categories by adding that such use would be "at hourly rates mutually agreeable to the parties" and would "depend[] on the requirements of the project."  CAR 972.  EY therefore did not, as IBM argues, reserve a unilateral right to add labor categories without the Army's approval.  If, during contract performance, EY determined that additional labor categories would be appropriate given the nature of the project, EY would have to engage in negotiations with the Army regarding hourly rates, and if the Army did not agree with the proposed rates for the proposed labor categories, EY would lack the right to use those additional labor categories.  Indeed, such negotiations likely could occur, consistently with the solicitation and with the final contract, even had EY not included this language in its proposal.  For these reasons, it was reasonable for the Army to conclude that the reservation-of-right language in EY's proposal conformed to the solicitation.

**3.  In any event, even assuming that the Army permitted EY to clarify[11] and revise its proposal, there is no merit to IBM's argument that the Army was required to give it the opportunity also to revise its proposal.**

As described above, the Army's judgment that EY's proposal conformed with the solicitation was reasonable.  But even assuming, for the sake of argument, that EY's reservation-of-right language conflicted with PWS 2.1.4 and that the Army in effect permitted EY to revise its proposal to eliminate that nonconformity, there is no merit to IBM's argument that the Army's failure to also give IBM an opportunity to revise its proposal was fundamentally unfair.

As IBM acknowledges, this procurement is governed by FAR Part 8, and therefore, it is analyzed under a standard of fundamental fairness.  See Unisys Corp. v. United States, 89 Fed. Cl. 126, 140 (2009).  Specifically, FAR 1.102-2(c)(3) provides that "[a]ll contractors and

---

[11] In this section, the Court uses the words "clarify" and "clarification," not in the sense of the term of art defined in FAR 15.306(a), but in the sense of their ordinary, lay meaning.

prospective contractors shall be treated fairly and impartially but need not be treated the same." Allowing EY to clarify that it intended to abide by PWS 2.1.4 and that it was not seeking the authority to reallocate labor hours or use additional labor categories without the Army's approval was not unfair under this standard.  Indeed, to the extent that there had been any doubt about whether EY's proposal conformed to the solicitation, it would not have been surprising for the Army to have sought such clarification rather than simply reject EY's proposal out of hand, given the huge price difference between that proposal and the one IBM submitted.

        Nor would it have been unfair or violative of FAR 1.102-2(c)(3) for the Army not to provide IBM with a similar opportunity.  IBM's proposal did not contain any potential nonconformities with the solicitation.  As there was no reason for the Army to seek clarification from IBM, it would not have been improper for the Army to give EY but not IBM the opportunity to modify the language of its proposal to clarify its intent.  And by giving EY the opportunity to clarify its proposal regarding the reservation-of-right language, the Army did not oblige itself to provide IBM with what it seeks here—the opportunity to engage in discussions aimed at reducing its price. Cf. Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. 16, 43-45 (2010), aff'd, 649 F.3d 1320 (2011) (in Subpart 8.4 procurement, where agency gave one offeror opportunity to clarify its proposal (but not revise its pricing), agency was not required to give protestor the opportunity to engage in "discussions" for purposes of allowing protestor to revise prices); G4S Tech. CW LLC v. United States, 109 Fed Cl. 708, 721-23 (2013) (agency not required to engage in discussions with protestor where its communications with awardee were solely for the purposes of clarifying the information already in their proposal).  After all, while offerors must "be treated fairly and impartially," they "need not be treated the same."  FAR 1.102-2(c)(3).  See Unisys Corp., 89 Fed. Cl. at 141 (observing that in FAR Subpart 8.4 procurement, agency that had engaged in discussions with one contractor concerning significant weaknesses in its proposal would not be required to engage in discussions with protestor about weaknesses that were not considered significant).

        It bears noting that the Court's conclusion likely would be different if this was a negotiated procurement governed by FAR Part 15.  Unless the solicitation specifies that an award will be made without discussions, FAR 15.306(d) requires that discussions "be conducted by the contracting officer with each offeror within the competitive range."  "At a minimum," it provides,

> the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond.  The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

FAR 15.306(d).  Based on this provision, in negotiated procurements, if the agency conducts discussions with one offeror, it is generally required to conduct discussions with all offerors

within the competitive range and to give all offerors an equal opportunity to revise their proposals.  See ManTech Telecomm. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 71 (2001); WorldTravelService v. United States, 49 Fed. Cl. 431, 440 (2001).  Such "formal and rigorous procedures" for negotiated procurements, however, do not apply in FAR Part 8 procurements.  Allied Tech., 94 Fed. Cl. at 44 (quoting Holloway & Co. v. United States, 87 Fed. Cl. 381, 393 (2009)).  Indeed, FAR 8.404 says so explicitly: "Part[] . . . 15 . . . do[es] not apply to . . . orders placed against Federal Supply Schedules contracts."  FAR 8.404(a).

Not only was this procurement a FAR Part 8 procurement to which Part 15 does not apply, but also, the solicitation provided that evaluations were intended to occur "without discussions," although "the Government reserve[d] the right to conduct discussions if later determined by the Contracting Officer to be necessary."  CAR 289.  In this regard, Unisys Corp. is directly on point.  89 Fed. Cl. at 140-41.  That case involved a FAR Part 8 procurement in which the solicitation included almost identical language regarding discussions, and the court rejected the plaintiff's argument that the agency violated the FAR by failing to engage in discussions with all offerors.  Id.  See also Distributed Solutions v. United States, 106 Fed. Cl. 1, 15 (2012) ("[T]hat [the agency] conducted discussions did not mean it had to comply with the strict procedures of FAR Part 15";"the solicitation not only did not contemplate discussions, but also did not condone a FAR Part 15 procedure governing discussions.").[12]

In short, whether the Army concluded that EY's proposal conformed to the solicitation at the outset or whether it instead permitted EY to clarify and revise its proposal, the Army treated all offerors fairly and impartially, even if it did not treat them the same.  Thus, Count I of IBM's complaint provides no legitimate grounds on which to invalidate the award to EY.

## B.  The Contracting Officer's Investigation of EY's Potential OCI Was Reasonable.

In Count II of its complaint, IBM alleges that [      ]'s involvement in drafting EY's proposal indicated "the existence or potential existence" of an OCI and that the Contracting Officer's investigation of this potential OCI was inadequate and unreasonable.  Compl. ¶¶ 8-9, 108-16; Pl.'s PI Mem. 29-33; Pl.'s MJAR Resp. 14-18.  The Court concludes that IBM has failed to demonstrate that the Contracting Officer acted unreasonably in determining that the record before her was adequate to conclude that [      ]'s work for EY did not give rise to an OCI.

---

[12] In support of its argument, IBM cites The Analysis Group, LLC, B-401726 et al., 2009 CPD ¶ 237 (Comp. Gen. Nov. 13, 2009), and Standard Communications, Inc, B-406021, 2012 CPD ¶ 51 (Comp. Gen. Jan. 24, 2012).  Pl.'s MJAR Resp. 6-8.  In The Analysis Group, however, the protester, unlike IBM, was similarly situated to the offeror who was afforded the opportunity to revise its proposal because the protester's proposal, too, contained several significant weaknesses.  2012 CPD ¶ 51 at 2.  To the extent that Standard Communications imposed a requirement that an agency must always allow all offerors to revise their proposals if it allows one to do so, the Court concludes that the decision is inconsistent with the Court of Federal Claims precedent (Unisys and Distributed Solutions) and does not comport with the regulatory language which requires treatment that is "equal" but not necessarily "the same."

In accordance with the FAR, Contracting Officers have a duty to "[i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible" and to "[a]void, neutralize, or mitigate significant potential conflicts before contract award." FAR 9.504(a). "These duties are separate." Turner Const. Co. v. United States, 645 F.3d 1377, 1386 (Fed. Cir. 2011) (citing PAI Corp. v. United States, 614 F.3d 1347, 1352 (Fed. Cir. 2010)). A Contracting Officer must first identify and evaluate potential conflicts, and "[i]f the potential conflict is determined to be a significant one, the [Contracting Officer] must avoid, neutralize, or mitigate it before the contract award." Turner Const., 645 F.3d at 1386. A potential conflict is significant if it "provides [one offeror] a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other [offerors]." PAI, 614 F.3d at 1352.

"[T]he FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1382 (Fed. Cir. 2009) (citing FAR 9.505 ("Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract. The exercise of common sense, good judgment, and sound discretion is required in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it.")). Thus, an award may be set aside based upon a violation of FAR 9.504 or 9.505 only if the Contracting Officer's evaluation of a potential significant OCI was arbitrary and capricious. Axiom, 464 F.3d at 1381-82. To demonstrate that the Contracting Officer's evaluation was arbitrary or capricious, "a protester must identify 'hard facts'; a mere inference or suspicion of an actual or apparent conflict is not enough." PAI, 614 F.3d at 1352 (citing CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).

Here, as its "hard facts" evidencing the potential existence of a conflict, IBM cites [     ]'s position as the program manager during the pre-award stages of a BPA issued in 2011 for FIAR work at DoD, for which at least two of EY's competitors submitted offers. Pl.'s PI Mem. 30; Pl.'s MJAR Resp. 15. According to IBM, a program manager ordinarily participates in the source selection. Pl.'s MJAR Resp. 15 (citing Defense Acquisition Guidebook § 14.2.1.2 at 1196-97 (Sept. 16, 2013)). Therefore, IBM argues, [     ] likely had access to proprietary technical and pricing information that would have given EY a competitive advantage. Pl.'s MJAR Resp. 16. Knowing this, IBM argues, the Contracting Officer acted irrationally in failing to inquire further to determine whether [     ] had access to proprietary information belonging to the BPA contractors. Pl.'s MJAR Resp. 3, 16.

Given the information in front of her, however, the Contracting Officer's evaluation of EY's potential OCI and her decision not to make further inquiry was not unreasonable. Specifically, the Contracting Officer relied upon the description of [     ]'s involvement in the 2011 procurement that was contained in a letter prepared by the Deputy Designated Agency Ethics Official in the DoD Office of the General Counsel in February of 2013. See CAR 1066-1071. That letter was prepared to provide [     ] with advice concerning [  ] prospective employment with EY as a Senior Manager following [  ] retirement from DoD. CAR 1066. It noted that [     ] had "served in a program management capacity during the pre-award phase" of the 2011 BPAs, and detailed [  ] involvement as follows:

Your program management duties related to the BPA procurement included development of the Statement of Work (SOW) and Independent Government Cost Estimate (IGCE), as well as assisting the Contracting Officer in determining the contract type and evaluation team members.  You were not the contracting officer representative or source selection authority on the six Blanket Purchase Agreements contracts, the total value of which were in excess of $10 million.

CAR 1066-67.[13]

Based on this information, and contrary to the inferences that IBM urges the Court to draw from [          ]'s job title, it was reasonable to read the letter as establishing that [          ]'s role in the 2011 BPAs was confined to "development of the Statement of Work (SOW) and Independent Government Cost Estimate (IGCE), as well as assisting the Contracting Officer in determining the contract type and evaluation team member"—all pre-award, non-source-selection tasks.  Indeed, the letter noted that [          ] was "not the contracting officer representative or source selection authority," further suggesting that [          ] played no role in source selection and had no reason to access proprietary information of EY's competitors.  Although the Contracting Officer could have taken an additional step, specifically asking EY if [          ] had accessed such information, her decision not to do so was not unreasonable.  Given the information before her, which had been gathered by DoD ethics officials precisely for purposes of advising [          ] regarding future employment with EY, it was not irrational for her to conclude that this additional step was unnecessary.[14]

---

[13] The letter also detailed [          ]'s ethics obligations with respect to his employment with EY.  It discussed, for example, statutory restrictions on [          ]'s communications with government employees on behalf of EY; the letter stated, however, that such restrictions would not bar [    ] from working on matters related to his federal position for [    ] new employer, "in-house, 'behind the scenes.'"  CAR 1070.  The letter further noted that, "[g]iven the period of time elapsed since [          ]'s pre-award involvement with these BPAs, **it is unlikely that your proposed work on behalf of Ernst & Young LLP would constitute prohibited communications**" under the statutes discussed.  CAR 1069 (emphasis in original).

[14] IBM notes that there is an apparent inconsistency between the Contracting Officer's statement that it would be "speculation that [          ] accessed proprietary information of the competitors" and her observation one sentence earlier that [          ] "may have received access to proprietary information relating to EY's competitors."  See Pl.'s PI Mem. 30-31.  The Court agrees that there is a tension between these two observations, but it attributes this apparent inconsistency simply to inelegant drafting.  In applying the arbitrary and capricious standard of review, the court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." State Farm, 463 U.S. at 43.  Here, the Contracting Officer's memorandum reflects that she read the ethics opinion, consulted with counsel, spoke with EY, and found insufficient evidence in the record before her to find that [          ] had, in fact, "accessed proprietary information."  In particular, the discussion of the role he played in the 2011 procurement contained in the advisory opinion did not include functions that would have given him such access.  See CAR 1066-1072.  Thus, she concluded that the possibility that he "may have received access to proprietary information" was a remote and speculative one.  CAR 1073.

Similarly, there is no merit to IBM's argument that [      ] may have had access to pricing information because it is likely that part of his responsibility as FIAR Director was to oversee the budget. See Pl.'s MJAR Resp. 16. Assuming that [      ] had responsibility at a high level for managing the budget, that does not necessarily (or even logically) imply that he would have drilled down into the individual prices and labor rates charged by the contractors, or known to what extent those rates (or the rates proposed by unsuccessful offerors) had been discounted.

Finally, the Court finds no arbitrariness in the Contracting Officer's conclusion that—even if [      ] had access to any proprietary information from the 2011 procurement (specifically, the discount rates that the various offerors proposed)—that information was more than three years old and too stale to provide EY with a competitive advantage. The Contracting Officer's conclusion regarding the staleness of the information, coupled with her observation that [      ] had no particular insight into how the present procurement would be evaluated for pricing, provides an additional, alternative justification for her resolution of the OCI issue.

In short, the scope of the Court's review of the Contracting Officer's decision concerning whether additional investigation was warranted is very narrow. The Court concludes that she acted within her discretion in relying upon the ethics letter and the information supplied by EY in determining the scope of her inquiry and in finding that there was no OCI. Accordingly, the government and EY are entitled to judgment on the administrative record as to the second Count in IBM's complaint.

### C.  The Army's Evaluation of EY's Transition Plan Was Not Irrational.

In Count III of its complaint, IBM argues that the Army's conclusion that EY's transition plan was acceptable was arbitrary and capricious. It focuses on the Army's evaluation of one of the five elements required for an acceptable transition plan, that such plan "[o]ffer[] an approach to ensure the availability of trained and qualified personnel." IBM argues that the Army found this element satisfied based only upon EY's suggestion that it would offer a subcontract to IBM, the incumbent. Pl.'s MJAR Resp. 19-20. Further, IBM argues, the solicitation required "offerors proposing subcontractors" to "provide evidence of the commitment from these organizations to perform as presented in the proposal," yet EY did not and could not provide evidence of any such commitment from IBM. Pl.'s PI Mem. 34-35 (citing, e.g., Sentrillion Corp. v. United States, 114 Fed. Cl. 557, 565-68 (2014)). The Court finds these arguments unpersuasive.

The solicitation lists the following requirements for an acceptable transition plan:

- Clearly demonstrates a reasonable, realistic approach for assuming full contractual responsibility without disruption or degradation of performance during the transition period.
- Identifies risk and proposes appropriate mitigation strategies.
- Proposes a realistic, achievable and efficient transition schedule and staffing plan.

- Ensures sufficient resources are on hand and available to begin work on the effort.
- Offers an approach to ensure the availability of trained and qualified personnel.

CAR 292-93.  The technical evaluation team concluded that EY met all of these requirements.  CAR 1058.  With respect to the requirement that the transition plan "offer[] an approach to ensure the availability of trained and qualified personnel," EY's proposal contained a sufficient basis for the Army's conclusion that EY had a complete transition team consisting of trained and qualified personnel even leaving aside whether it secured a subcontract with IBM.  For example, under the caption "Transition Team Qualifications," EY stated that "[o]ur TP offers the availability of trained and qualified personnel," explaining that EY had a "roster of current qualified personnel" who could "deliver on Day 1 of the engagement."  CAR 874.  It also noted that it had "a robust cadre of team members that have both the experience and qualifications needed."  CAR 874.

It is clear from EY's proposal that, while its transition plan mentioned the possibility of offering a subcontract to IBM or recruiting select IBM personnel, CAR 874, this suggestion was only one of the components of the plan that addressed the requirement that trained and qualified personnel be available for the transition.  In fact, in the evaluation, the Army referenced other positive aspects of EY's transition plan relevant to this requirement.  For example, the Army noted that "[o]n page 2 [of EY's transition plan], E&Y presented a structured approach to transition in within the 45 days allotted."  CAR 1058.  The Army also observed that, on pages three and four of the transition plan, "E&Y identified five (5) potential risks to transition and documented several mitigation strategies for each risk."  CAR 1058.

Also instructive is the Combined Contracting Officer Statement and Legal Memorandum ("CO Statement") submitted by the Army in the related GAO bid protest.  As that Statement explained,

> E&Y's transition plan was found realistic due to the fact that their key personnel were scheduled to commence work on the project immediately and would thus be available for the entire transition period.  Their Federal experience showed they possessed the right skills to manage an effective transition.  The transition risk and associated mitigation strategy outlined in their transition plan aligns closely what the ASA(FM&C) management had previously envisioned.  Their plan provided a solid communications strategy as well as a strategy for mitigating risks filling technical knowledge gaps during this short 45 day period.  Therefore, as stated in the SSDD, E&Y "met all of the requirements" and "was rated as Acceptable".

CAR 1660 (internal citations omitted).[15]

---

[15] IBM characterizes the information in the CO Statement as "post hoc rationalizations offering 'new rationales for past decisions'" and argues that the Court should therefore disregard it.  Pl.'s PI Mem. 38.  This court, however, has considered "the agency's explanations to GAO" as "explanatory materials that do not offer new rationales for past decisions" but "illuminate the

Finally, the Court turns to IBM's argument that the Army should have found EY's transition plan unacceptable because EY supplied no evidence of a commitment by IBM to enter a subcontract.  This argument lacks merit, first, because EY did not represent that IBM was part of its team or that it had secured a subcontract with IBM; rather, EY simply suggested that it may, in the future, offer IBM a subcontract.  See CAR 874.  For all of the subcontractors that EY stated were on its subcontracting team, EY provided the required evidence of commitment.  See CAR 583-84, 588-678.

Because EY did not represent that IBM was a part of its subcontracting team, the cases that IBM cites in support of its argument are inapposite.  For example, in Sentrillion, the solicitation required each offeror to supply "signed partnering agreements" with any subcontractors to be used as evidence of their commitment.  114 Fed. Cl. at 566-67.  The court held that the "teaming agreements" proffered by the protester, which stated that the parties would enter into "good faith negotiations with the intent of entering into a mutually acceptable subcontract agreement," did not satisfy the solicitation's requirement.  Id. at 567.  See also LaSalle Partners v. United States, 48 Fed. Cl. 797, 803-04 (2001) (holding that offerors did not establish that they had entered a joint venture because the solicitation required submission of a copy of the executed joint venture agreement, and the letter proffered by offerors did not satisfy solicitation's requirements); Motorola Solutions, Inc., B-409148 et al., 2014 CPD ¶ 59 at 7 (Comp. Gen. Jan. 28, 2014) (finding that agency improperly accepted awardee's proposal because solicitation required evidence of awardee's ability to obtain certain equipment, which awardee did not provide).  Here, by contrast, EY recognizes that IBM has given no commitment to enter into a subcontract.

Thus, the Army's rating of EY's transition plan as acceptable was not arbitrary or capricious.  Count III of IBM's complaint, like the others, provides no basis for the Court to set aside the award to EY.

## CONCLUSION

Based on the foregoing, IBM's motion for judgment on the administrative record is **DENIED**, and the government's and EY's cross motions are **GRANTED**.  The Clerk shall enter judgment accordingly.

Pursuant to the Court's September 19, 2014 Protective Order, this Opinion and Order has been issued under seal.  The parties shall have two weeks to propose redactions and, accordingly, shall file such proposed redactions on or before Friday, November 21, 2014.

**IT IS SO ORDERED.**

---

methodology the agency employed in making its determination."  D&S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 35 (2011) (citing CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 376 n.15 (2010)).  Viewed in that light, the CO Statement provides further support for the Army's contention that it relied upon more than simply EY's intention to offer IBM a subcontract in concluding that EY had demonstrated an approach that ensured the availability of trained and qualified personnel for the transition.

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge