# In the United States Court of Federal Claims

No. 14-864C
(Filed Under Seal: October 3, 2014 | Reissued: November 25, 2014)

| | |
|---|---|
| IBM CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Post-Award Bid Protest; Preliminary |
| ) | Injunction; Irreparable Harm; Balance of |
| THE UNITED STATES OF AMERICA, ) | Hardships; Supplementing the |
| ) | Administrative Record |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| ERNST & YOUNG LLP, ) | |
| ) | |
| Defendant-Intervenor. ) | |

**OPINION AND ORDER DENYING PRELIMINARY INJUNCTION, DENYING PLAINTIFF'S MOTION TO COMPLETE AND SUPPLEMENT THE ADMINISTRATIVE RECORD AND FOR LEAVE TO TAKE RELATED DISCOVERY, AND ESTABLISHING BRIEFING SCHEDULE FOR CROSS MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Currently before the Court in this post-award bid protest are plaintiff's motion for a preliminary injunction and plaintiff's motion to supplement the administrative record and take related discovery. For the reasons set forth below, both motions are **DENIED**.[*]

---

[*] This Opinion was originally issued under seal. Pursuant to this Court's September 19, 2014 Protective Order, ECF No. 15, the parties were given the opportunity to request redactions. In a joint submission, filed October 16, both plaintiff ("IBM") and the intervenor ("EY"), requested redactions of references to their employees by name. EY, in addition, requested redactions of direct quotes from EY's technical proposal whose disclosure EY contends would cause it competitive harm by allowing competitors to use EY's approach themselves in drafting the language of their proposals.

The Protective Order defines "protected information" as "information that must be protected to safeguard the competitive process, including source selection information, proprietary information, and confidential information." Beyond this, the Court must weigh any proposed redaction against a "presumption of public access to judicial records." Baystate Techs., Inc. v. Bowers, 283 F. App'x 808, 810 (Fed.Cir.2008) (per curiam) (citing Siedle v. Putnam Invs., Inc., 147 F.3d 7, 9 (1st Cir.1998); Poliquin v. Garden Way, Inc., 989 F.2d 527, 533 (1st

# BACKGROUND[1]

## I.     The RFP

Plaintiff IBM Corporation ("IBM") is the incumbent contractor providing audit readiness services for the Department of the Army ("the Army" or "the agency") in support of the Army's effort to produce auditable financial statements by September 2017, as directed by the Department of Defense ("DoD").[2]  Conformed Request for Proposals ("RFP") § C at 8.[3]  As the expiration of IBM's contract approached, the Army issued RFP No. W91CRB-13-R-0034 ("solicitation" or "RFP") on September 30, 2013.  AR 51.  The RFP contemplated the award of a time-and-materials ("T&M") contract, Conformed RFP § B, to assist the Army in achieving auditability with respect to four General Fund annual financial statements by the September 2017 deadline "through improvements in the supporting financial systems, Army financial management processes, effective internal controls and supporting documentation."  Conformed RFP § C.1.3.  The contract would include a one-year base period and two one-year options.  Id. § B.  By March 5, 2014, the final date on which offers were due, the RFP had been amended eight times.  See AR 116-257.

According to the RFP, the Army's efforts to meet the September 17, 2017 deadline would involve "one of the most complex and challenging transformations ever attempted."  Conformed RFP § C.1.2.  The RFP provided that the contract would be awarded on a best-value basis "to the Offeror who gives the Government the greatest confidence that it will best meet or exceed the requirements."  Id. § M.A.

---

Cir.1993)).  In light of this presumption, the Court accepts the parties' proposed redactions of information identifying particular individuals, and these redactions are indicated by brackets.  The Court, however, is not persuaded by EY's rather conclusory assertions that redacting the other information quoted from its proposal is necessary to safeguard the competitive process.  Moreover, publishing this information without redaction would serve the public interest because such information, particularly the discussion of EY's proposal to offer a subcontract to IBM, is crucial to any reader's understanding of the Court's reasoning in the case.

[1] Due to the expedited nature of the briefing and argument of the pending motion for a preliminary injunction, the Court's recitation of the background facts is necessarily abbreviated.

[2] Federal agencies are required by law to produce annual audited financial statements.  See Chief Financial Officers Act of 1990, Pub. L. 101-576, 104 Stat. 2838 (1990); Government Management Reform Act of 1994, Pub. L. 103-412, 108 Stat. 285 (1994); National Defense Authorization Act of 2012, Pub. L. 112-81, 125 Stat. 1298 (2011).  DoD's effort to bring itself into compliance with these requirements by September 2017 is known as "FIAR," which stands for "financial improvement and audit readiness."

[3] The Conformed RFP is attached to Plaintiff's Memorandum in Support of Its Motion for Temporary Restraining Order and Preliminary Injunction ("Pl.'s PI Mem."), ECF No. 4, at Exhibit A.  It can also be found in the administrative record ("AR") at 258-99.

The RFP identified seven factors for evaluation: (1) Experience, (2) Approach to Sample Scenario, (3) Past Performance, (4) Key Personnel, (5) Transition Plan, (6) Small Business Utilization Factor, (7) Price. Id. § M.B.  The best value trade-off required weighing Factors 1 and 2 against Price. Id.  Factors 1 and 2 were equally important and, when combined, were more important than Price. Id. § M.C.  Factors 3 through 6 were to be evaluated on a pass/fail basis only and would not play a role in the best value analysis. Id.  An offeror who received a rating of "unacceptable" for any of the six non-price factors was not eligible for award. Id. § M.D.

According to the RFP, offerors' total evaluated prices consisted of their prices for (1) the Labor contract line item numbers ("CLIN") X00l and (2) the other direct costs ("ODC") CLINs X002 (which all offerors were required to price at $400,000 per CLIN, id. § B, CLINs X002). Id. § L at 37.  As required by FAR 16.601(d)(2), the RFP placed a ceiling on the contractor's level of effort under the T&M Labor CLINs in section C.2.4.1 in the Performance Work Statement ("PWS").  See id. § C.2.4.1.  The provision stated,

> The Contractor level of effort to complete deliverables under this contract shall not exceed the following:
>
> | Labor Category | Base Period Hours (CLIN 0001) | Option Period 1 Hours (CLIN 1001) | Option Period 2 Hours (CLIN 2001) |
> | --- | --- | --- | --- |
> | Director | 1,242 | 1,117 | 950 |
> | Senior Manager I | 23,549 | 21,194 | 18,015 |
> | Manager I | 87,339 | 78,605 | 66,814 |
> | Senior Consultant I | 111,715 | 100,543 | 85,462 |
> | Consultant I | 91,117 | 82,005 | 69,705 |
> | Research Assistant | 93,015 | 83,713 | 71,156 |

Id.  Offerors were instructed to propose rates per labor category based on their current GSA rates, and they were encouraged to offer discounts on those rates. Id. § L at 37.  Offerors' prices for Labor CLINS, then, amounted simply to their proposed rates multiplied by the number of hours specified in section C.2.4.1. Id. § L at 37.

During the procurement, some offerors asked the Army to clarify the extent to which section C.2.4.1 permitted a successful offeror to reallocate hours among the labor categories. See, e.g., Q&A Nos. 21, 71, 73, 84-86.[4]  One offeror asked, "Will the successful offeror have flexibility to reallocate the hours among labor categories during project execution, as long as we do not exceed the ceiling?"  Q&A No. 136.  The Army responded, "As approved by the COR

---

[4] Initially, there was some dispute between the parties about which set of Q&As was attached to each Amendment, and there is still some dispute about which Q&As, if any, were incorporated into the final contract.  The language of the Q&A relevant to this protest was, all parties agree, No. 136 in the set of Q&As issued with Amendment 8 to the RFP as Attachment 7.  The version of the administrative record cited in this opinion incorrectly represents that this set of Q&As was issued with Amendment 5.  The government, however, has since submitted a corrected administrative record.

3

[contracting officer's representative], the successful offeror will have the flexibility to reallocate hours as long as the ceiling is not exceeded." Id.

### II. Proposals, Evaluation, Award, and GAO Protest

Three offerors submitted proposals, including IBM and defendant-intervenor Ernst & Young LLP ("EY"). For Factor 1, the Technical Evaluation Team rated both IBM and EY as "outstanding." See AR 1107. For Factor 2, it rated IBM as "outstanding" and EY as "acceptable." See AR 1107. For all other non-price factors, both IBM and EY received "acceptable" ratings. The most significant difference between IBM and EY was in their prices: IBM's total evaluated price was $85,986,434, while EY's total evaluated price was $55,553,597. AR 1122. Regarding this price differential, the Source Selection Advisory Council ("SSAC") noted that EY heavily discounted its GSA rates per labor category and found no indication of mistake in EY's pricing. AR 1125.

Another difference between IBM's proposal and EY's proposal was not noted in any of the Army's evaluation materials but takes center stage in IBM's bid protest. Specifically, under the heading "Administrative Items," EY included the following language:

> Team EY reserves the right to reallocate hours between labor categories during the performance of this engagement to perform the services required, provided the reallocation does not result in exceeding the ceiling price established in the contract.

AR 972. In the same section of the proposal, EY also stated,

> Team EY reserves the right to [
>
>                                                                                              ]

AR 972.

By contrast, IBM's proposal regarding the potential for the reallocation of hours stated as follows:

> In completing RFP Pricing Table, Attachment 3, IBM has used the Government provided hours by labor category and applied our proposed fixed hourly rates. In performance of the contract there is a need for flexibility in the labor mix to effectively support this work. In accordance with RFQ Question and Answer number 136, with COR approval, we have the flexibility to reallocate hours by labor categories within the overall task order value without a contract modification.

AR 529.

Before rendering an award decision, the Army contacted each offeror "seeking clarifications relating [to] their ethics policies and information to understand any potential

4

[organizational conflicts of interest ("OCIs")]." AR 1075.  When contacting EY, the Army specifically inquired about the role in preparing EY's proposal, if any, played by [          ], an EY employee who had served as Director of Financial Improvement and Audit Readiness (FIAR Director) in the Office of the Undersecretary of Defense-Comptroller until March 2013. See AR 1066, 1075.  EY responded that [          ] was involved in preparing EY's proposal. AR 1073.  As part of her review, the contacting officer secured a copy of an opinion provided to [     ] by ethics officials at DoD.  See AR 1066-72.  Based on that opinion, the contracting officer found that [          ] "had acted as a program manager during the pre-award stages of a BPA issued in 2011 for similar work at the DoD level."  AR 1073.  She concluded that "while [ ] may have received access to proprietary information relating to EY's competitors relating to that acquisition, I do not find that this provided EY with any competitive advantage."  AR 1073. Specifically, she explained that "[i]t would only be speculation that [          ] accessed proprietary information of the competitors," and that even if he had accessed such information, the information was now three years old and therefore stale.  AR 1073.  She also stated that "[          ] had no insight into this specific requirement, the way this requirement would be evaluated for pricing, or the way in which the competitors of EY would base their proposals and discounts."  AR 1073.

On May 22, 2014, the Army awarded the new audit-support contract to EY, concluding that the additional strengths provided by IBM did not warrant paying a premium of $30,432,837 (or 54.8%).  AR 1153.  The Source Selection Authority ("SSA") also praised EY with respect to the transition plan factor for proposing to "offer[] the incumbent a role as a sub-contractor," calling this "a sound approach to ensure availability of trained and qualified personnel."  AR 1147.

IBM protested the award at the Government Accountability Office ("GAO"), and the Army issued a stop-work order to EY.  See AR 1626-29.  To avoid an interruption in services during the pendency of the protest, the Army negotiated a bridge contract with IBM, which expires on November 9, 2014.  Steffens Decl. ¶ 6, ECF No. 14, Sept. 19, 2014.

GAO denied the protest on September 5, 2014.  See Pricewaterhouse Coopers LLP, B-409885 et al. (Comp. Gen. Sept. 5, 2014) ("GAO Decision").[5]  Shortly thereafter, on September 10, 2014, EY resumed transition work under the contract.  AR 1800.

### III.   IBM's Protest in This Court

IBM filed a bid protest action in this Court on September 17, 2014, a week after EY began its transition work.  See Compl., ECF No. 1.  Along with its complaint, IBM filed a motion for a temporary restraining order ("TRO") and a preliminary injunction.  Pl.'s Mot. for TRO & Mot. for Prelim. Inj., ECF No. 3.  On September 18, 2014, EY filed an unopposed

---

[5] The GAO Decision is attached to Plaintiff's Memorandum in Support of Its Motion for Temporary Restraining Order and Preliminary Injunction at Exhibit H.  It can also be found at AR 1777-99.

motion to intervene, which the Court granted.  EY Mot. to Intervene, ECF No. 12; Order, ECF No. 13, Sept. 18, 2014.

At a status conference on September 19, 2014, the parties discussed an expedited briefing schedule on IBM's motion.  During that discussion, counsel for IBM noted that IBM also intended to move for leave to supplement the administrative record.  Based on the matters discussed at the status conference, the Court issued an order setting forth an expedited briefing and oral argument schedule on the motion for a preliminary injunction, which incorporated deadlines for filing the administrative record and briefing the motion to supplement the record.  See Order, ECF No. 16, September 19, 2014.  The Court's order also denied IBM's motion for a TRO, finding that IBM had failed to establish that it would suffer irreparable harm before the Court could rule on its motion for a preliminary injunction.  Id.

On September 30, 2014, the Court held oral argument on IBM's motion for a preliminary injunction.  For the reasons set forth below, the Court denies IBM's motion for a preliminary injunction as well as its motion to supplement the administrative record and engage in discovery.  In addition, the Court establishes an expedited briefing schedule for final resolution of this case on the merits by no later than November 7, 2014 (two days before the expiration of IBM's bridge contract).

## DISCUSSION

**I.     IBM's Motion for a Preliminary Injunction Is Denied**

### A.  Standards for Granting a Preliminary Injunction

The standards for determining whether to grant a preliminary injunction are well established.  In order to secure such relief, the moving party must demonstrate that: (1) it is likely to succeed on the merits; (2) it will be irreparably harmed without injunctive relief; (3) the balance of hardships tips in its favor and (4) the public interest favors the grant of injunctive relief.  Am. Signature, Inc. v. United States, 598 F.3d 816, 823 (Fed Cir. 2010) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 19 (2008)); see also Erico Int'l Corp. v. Vutec Corp., 516 F.3d 1350, 1353-54 (Fed. Cir. 2008) (discussing injunctive relief in a patent context); FMC Corp. v. United States (FMC), 3 F.3d 424, 427 (Fed. Cir. 1993).  "No single factor is determinative, and 'the weakness of the showing regarding one factor may be overborne by the strength of the others.'"  Contracting Consulting Eng'g LLC v. United States, 103 Fed. Cl. 706, 709 (2012) (quoting FMC, 3 F.3d at 427).  At the same time, "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify . . . denial" of a preliminary injunction.  Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 953 (Fed. Cir. 1990).

### B.  IBM's Arguments

As noted above, EY began performing its transition work on the contract on September 10, 2014 and is scheduled to continue to perform that work for forty-five days.  IBM's bridge contract expires on November 9, 2014.  At that point, EY will take over performance of the

contract.  In its motion, IBM seeks to enjoin EY from continuing to perform transition work while the case is before the Court.

With regard to the merits, IBM asserts a likelihood of success with respect to its three grounds for challenging the award to EY.  First, IBM argues that it is likely to prevail on its claim that language in EY's proposal reserving the rights to reallocate labor hours and to create new labor categories conflicted with section C.2.4.1 in the PWS and that, by accepting EY's proposal, the Army unlawfully relaxed that section's requirements for EY but not for IBM or any other offeror.  Pl's PI Mem. 21-29.  Second, IBM argues that it is likely to succeed on the merits of its claim that the contracting officer's investigation of the potential OCI raised by [         ] involvement in drafting EY's proposal was inadequate.  Pl's PI Mem. 29-33.  Finally, IBM contends that it has established a likelihood of succeeding with respect to its argument that the Army's evaluation of EY's transition plan was irrational and contrary to the RFP's stated requirements.  Pl.'s PI Mem. 34-38.

Regarding irreparable harm, IBM advances two arguments.  First, IBM asserts that, "if performance is allowed to proceed, there is a significant risk that if IBM prevails on the merits, its relief will be limited to bid and proposal costs, and it will lose the opportunity to fairly compete for the contract."  Pl.'s Reply in Supp. of Mot. for Prelim. Inj. 21 ("Pl.'s PI Reply"), ECF No. 41.  Specifically, IBM argues that "[i]f E&Y is allowed to continue transition and performance while this action is pending, and IBM subsequently prevails on the merits, the Army will undoubtedly oppose the issuance of permanent injunctive relief, arguing that it would be too costly and disruptive to halt performance of E&Y's contract," and "as a court of equity, the Court will be bound to consider such arguments in balancing the harms."  Pl.'s PI Reply 22.

Second, IBM argues that if the transition continues, it "is likely to lose Key Personnel and other employees to E&Y, and there is a risk that E&Y will be exposed to IBM's proprietary methods and processes during the transition period."  Pl.'s PI Reply 21-22.  These consequences, IBM contends, would put it at a competitive disadvantage for any re-competition that might be ordered.  Pl.'s PI Reply 22, 25.  Specifically, IBM claims that since receiving the contract award, EY has "aggressively recruited" certain IBM employees.  Pl.'s PI Reply 26.  If the Court ultimately were to order re-solicitation, IBM contends, "IBM would lose the incumbent advantage of continuity of personnel and would have to hire, on short notice, qualified replacement personnel, which may not be possible and could raise costs."  Pl.'s PI Reply 26.  In addition, IBM argues that if the transition is allowed to continue, "E&Y will be able to observe and gain exposure to IBM's proprietary tools, processes and methodologies."  Pl.'s PI Reply 27.  "With such information in hand," IBM argues, "E&Y could improve the quality of its technical proposal—which previously was rated lower than IBM's and is thus a significant discriminator in IBM's favor."  Pl.'s PI Reply 27.

On the other hand, IBM argues, the government would not suffer significant harm if the transition work were enjoined.  It alleges that "a preliminary injunction would merely delay transition for about two months" and, in the meantime, "the Army can obtain all of its audit support needs under IBM's existing bridge contract, which can be extended through at least January 9, 2015—more than 60 days after this Court anticipates deciding this bid protest."  Pl.'s PI Reply 3-4.

### C. Application of Legal Standards for Preliminary Injunctive Relief

As noted above, a denial of preliminary relief may be justified by "the absence of an adequate showing with regard to any one factor." Chrysler Motors Corp., 908 F.2d at 953. In this case, the Court finds that—leaving aside whether IBM has established a likelihood of success on the merits of any of its claims (a question that the Court will not address in this opinion)—it has failed to demonstrate that it will suffer irreparable harm in the absence of a preliminary injunction or that the balance of hardships tips in its favor. Accordingly, its motion for a preliminary injunction must be denied. Cf. Winter, 555 U.S. at 23-24, 32-33 (declining to address court of appeals' holding that plaintiffs had established a likelihood of success on the merits and denying preliminary injunction based on conclusion that public interest does not favor preliminary relief).

1. **IBM has failed to show that it will suffer irreparable harm if preliminary relief is not granted.**

"A preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown." Qingdao Taifa Grp. v. United States, 581 F.3d 1375, 1379 (2009) (quoting Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir. 1983)). Such a threat of imminent, irreparable injury exists when a plaintiff shows that, absent a preliminary injunction, it would be deprived of the only remedy available were it to succeed on the merits. Qingdao Taifa Grp., 581 F.3d at 1379 (citing Zenith Radio, 710 F.2d at 810). "In other words, irreparable injury may be found if the grant of a preliminary injunction is the only way to preserve the plaintiff's ability to litigate its claim." Eskridge Research Corp. v. United States, 92 Fed.Cl. 88, 98 (2010).

IBM has failed to show that the grant of preliminary relief is necessary to preserve IBM's ability to litigate its claim and secure full relief. First, the Court is not persuaded by IBM's argument that preliminary relief is required because allowing EY to continue transition work over the next four to five weeks will prejudice IBM's ability to ultimately secure permanent injunctive relief. IBM's observation that allowing the transition to go forward now may strengthen the government's argument against permanent injunctive relief a month from now would apply in any bid protest case in which a preliminary injunction is sought to prevent a contract award from going forward. Its argument does not give adequate weight to the Court's "broad equitable powers to fashion an appropriate remedy" in a bid protest case. Turner Constr. Co. v. United States, 645 F.3d 1377, 1388 (Fed. Cir. 2011). In light of those powers, which give the Court significant discretion to choose a remedy should it find IBM's claims meritorious, the Court cannot give much credence to IBM's argument that it will be irreparably harmed if the Court fails to stop EY's transition work now because the Army will later be able to cite the completion of transition work as an argument against a grant of permanent injunctive relief.[6]

---

[6] IBM's reliance upon PGBA LLC v. United States, 60 Fed. Cl. 196 (2004), in support of its allegation of irreparable harm on this basis is unavailing. See Pl.'s PI Reply 22-23. For one thing, unlike IBM, PGBA made an "early strategic decision not to seek a preliminary injunction to forestall the government and [the awardee] from continuing with implementation of the contract." 60 Fed. Cl. 567, 569 (2004). Further, the court's decision not to grant injunctive relief in PGBA was based on the particular facts and balance of interests in that case. In PGBA,

In fact, the court has consistently found unpersuasive arguments like IBM's in which incumbents seek to base a showing of irreparable harm on the possibility that the successful offeror would gain advantages during a transition period that might affect the successful protester's capacity to compete for a new contract. See Eskridge, 92 Fed. Cl. at 99 ("[T]he plaintiff's contention that without a preliminary injunction, [the awardee] will become so entrenched that [plaintiff] will have lost its opportunity to compete does not demonstrate irreparable harm."); Sierra Military Health Servs., Inc. v. United States, 58 Fed. Cl. 573, 582 (2003) (noting that courts have rejected the argument that the contract awardee would become so entrenched during transition that the protester would be irreparably harmed without an injunction). Thus, IBM's assertion that, unless the transition is stopped, there exists a risk that EY will be able to observe and gain exposure to IBM's proprietary tools and processes, thereby allowing EY to improve the quality of its technical proposal and gain a competitive advantage, is not enough to establish irreparable injury.

Finally, the Court also finds unpersuasive IBM's argument that irreparable harm will result because it will lose employees to EY if the transition is not halted. For one thing, IBM's argument is not supported by its declarations which show that—notwithstanding that EY has been "aggressively recruiting" IBM employees since last May—it appears that only one IBM employee has jumped ship. See [     ] Decl. ¶ 4-5.[7] And that employee is not among those designated as "Key Personnel" under IBM's proposal. See Oral Arg. Tr. 56.

Second, and in any event, the mere fact that an incumbent's employees begin to move over to work for the awardee does not, without more, constitute irreparable harm. See Contracting Consulting Eng'g, 103 Fed. Cl. at 713; Eskridge, 92 Fed. Cl. at 99 ("[T]he decision of [incumbent-protester's] employe[e]s to work for [awardee] is not the kind of injury that constitutes irreparable harm."); Sierra Military Health Servs., 58 Fed. Cl. at 582. As the court observed in CRAssociates, Inc. v. United States, 103 Fed. Cl. 23 (2012), these kinds of "harms alleged by plaintiff are the sorts of things that any incumbent would experience upon the loss of a successor contract," id. at 26, and surely not every incumbent is entitled to the "drastic and extraordinary remedy" provided by a preliminary injunction. Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1324 (Fed. Cir. 2004).

**2. IBM has failed to show that the balance of hardships tips in its favor.**

---

the court concluded (after an evidentiary hearing) that setting aside the contract that had already gone into effect would be too disruptive because, among other reasons, it would adversely affect third parties by sowing confusion among health care providers and beneficiaries covered under the TRICARE program. Id. The case certainly does not establish anything close to a rule or even a preference for denying permanent injunctive relief whenever the government has already begun transition to the new contract that is the subject of the protest.

[7] The Declaration of [     ] is attached to IBM's reply in support of its motion for a preliminary injunction as Exhibit 2.

In addition to failing to show that it will be irreparably injured if preliminary relief is not granted, IBM has not shown that the balance of hardships tips in its favor.  For one thing, granting IBM's request would actually upset, rather than preserve, the status quo.  Thus, EY has been performing transition work under the new contract since September 10.  IBM did not file its complaint or request for a TRO until September 17, 2014, which is twelve days after GAO denied its bid protest and a week after EY began its forty-five-day transition period.  Granting preliminary relief now would mean that EY would have to stop performance, therefore jeopardizing not only the Army's ability to meet its deadline, but also the livelihood of some 100 EY employees currently working on the transition as well as employees of EY's teammates on the contract.  [     ] Decl. ¶¶ 11-12, ECF No. 33.  At the same time, even if preliminary relief is denied, IBM will continue to have the benefit of its bridge contract, which does not expire until November 9, 2014.  When coupled with the lack of irreparable injury to IBM, these consequences to the government and to EY (as well as the public interest), militate against a grant of the extraordinary remedy of preliminary injunctive relief.

## II. IBM's Motion to Complete and Supplement the Administrative Record and to Take Related Discovery Is Denied.

IBM has filed a motion seeking leave to supplement the administrative record and leave to take related discovery.  It argues that completion and supplementation of the record is necessary for effective judicial review of its claim that the Army relaxed the solicitation's mandatory staffing requirements for EY and its claim that the contracting officer failed to adequately investigate the potential OCI posed by the involvement of [              ] in the preparation of EY's proposal.  Pl.'s Mem. in Supp. of Mot. to Complete & Supplement AR 2-3 ("Pl.'s AR Mem."), ECF No. 29.  For the reasons set forth below, IBM's motion is **DENIED**.

### A. Standards for Granting a Motion to Supplement the Administrative Record

"As a general rule, in determining whether an agency's actions are arbitrary or irrational, the 'focal point for judicial review [of the agency's decision] should be the administrative record already in existence, not some new record made initially in the reviewing court.'" Knowledge Connections, Inc. v. United States, 79 Fed. Cl. 750, 759 (2007) (alteration in original) (quoting Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985)).  The purpose of this rule "is to guard against courts using new evidence to 'convert the arbitrary and capricious standard into effectively de novo review.'" Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)).  Therefore, "supplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review." Axiom, 564 F.3d at 1380 (internal quotations omitted).

### B. Neither Supplementation of the Administrative Record Nor Additional Discovery Are Warranted; the Existing Administrative Record Provides an Adequate Basis for Reviewing Plaintiff's Claims

As noted, IBM argues that completion and supplementation of the record is necessary for effective judicial review of two of its claims.  First, regarding its claim that the Army relaxed the staffing requirements for EY, IBM argues that, after the Army awarded the contract to EY, the

10

Army issued a draft contract to EY that inserted the following language into the PWS: "As approved by the COR, the Contractor will have the flexibility to reallocate hours as long as the ceiling is not exceeded."  Pl.'s PI Mem. 12; see also AR 1154-56, 1172.  The next day, however, the Army sent EY a revised contract that removed that language.  Pl.'s PI Mem. 12; see also AR 1191-94, 1211.  IBM requests that the Court order production of "all communications, both within the Army and between the Army and E&Y, regarding (a) the decision to insert a COR approval requirement in the initial draft contract sent to E&Y; and (b) the subsequent decision to remove that language from the final executed contract."  Pl.'s AR Mem. 3.  In addition, "[t]o the extent such communications were oral rather than written, IBM seeks to depose the Contracting Officer and Contract Specialist, both of whom were involved in communications with E&Y regarding the draft and final contract."  Pl.'s AR Mem. 2.

In response to IBM's motion, the government represents that it has produced all documents relevant to the Court's review of this procurement.  Def.'s Opp'n to Pl.'s Mot. for Disc. & to Complete & Supplement AR 4 ("Def.'s AR Resp."), ECF No. 36.  Moreover, the government argues that the depositions IBM requests are unwarranted.  With respect to IBM's claim that the Army relaxed the mandatory staffing requirements for EY, the government notes that the record already contains a declaration by the contracting officer, in which the contracting officer explains why he added the language IBM identifies and then took it out.  Def.'s AR Resp. 5.  In any event, the government argues, the addition and subsequent removal of the language after the award "do not concern the Army's evaluation of E&Y's proposal, and should not be the focus of the Court's review or decision."  Def.'s AR Resp. 6.

The Court agrees with the government.  First, at oral argument, counsel for IBM acknowledged that IBM had no basis for contesting the government's representations that no additional documentation of post-award communications between the Army and EY exists.  Oral Arg. Tr. 29.  And while IBM continues to press its requests for depositions on the matter, the Court concludes that granting discovery on this point would be inappropriate.  The central issue with respect to IBM's legal claim is whether EY's proposal conflicted with a material term of the solicitation.  Although IBM posits that further investigation into the post-award dealings between the Army and EY might shed further light on the parties' understanding of the language in EY's proposal, forgoing such additional investigation certainly will not "preclude[] effective judicial review" of IBM's claims, which are most appropriately determined on the basis of the paper record that includes the solicitation, the proposal, and the contract documents.  Axiom, 564 F.3d at 1380.

Regarding its claim that the contracting officer failed to adequately investigate EY's potential OCI, IBM argues that it has identified the "hard facts" sufficient to show that the Army should have disqualified EY.  Pl.'s AR Mem. 9 (citing Turner Constr., 94 Fed. Cl at 572-73).  "If, however, the Court believes that more hard facts are needed to establish the potential existence of a conflict," IBM argues, "those facts are in the possession of [        ] and the government," and "IBM therefore seeks leave to depose [        ] regarding what information he had access to in his capacity as FIAR Director, and to depose an appropriate government official regarding the same topic."  Pl.'s AR Mem. 11 (internal citations omitted).

Deposing [        ] regarding the information he accessed as FIAR Director at DoD would be inappropriate.  The Court's role here is to review the reasonableness of the

11

investigation that the contracting officer actually conducted, not to conduct its own investigation. The focus of the court's review should be "the information upon which an agency relied when it made its decision, together with any documentation that reveals the agency's decision-making process." See Joint Venture of Comint Sys. Corp. v. United States, 100 Fed. Cl. 159, 166 (2011). Any information gleaned from a deposition of [      ] would go, at best, to whether or not an actual OCI existed. It would not be relevant to whether the contracting officer's investigation or the conclusions she reached on the basis of that investigation were reasonable. The Court's consideration of such information, therefore, would "convert the arbitrary and capricious standard into effectively de novo review"—precisely what the Court should avoid when deciding whether to permit supplementation of the record. Axiom, 564 F.3d at 1380. Consequently, IBM's request to depose [      ] is denied.

## CONCLUSION

On the basis of the foregoing:

1. The Plaintiff's Motion for a Preliminary Injunction is **DENIED**.

2. Plaintiff's Motion to Complete and Supplement the Record and for Leave to Take Related Discovery is **DENIED.**

The Court establishes the following schedule for completion of briefing on cross motions for judgment on the administrative record:

   a. The Court will treat Plaintiff's Memorandum in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction as a Motion for Judgment on the Administrative Record;

   b. The Court will treat the Intervenor's Opposition to the Plaintiff's Motion for a Preliminary Injunction as a Cross Motion for Judgment on the Administrative Record and Opposition to Plaintiff's Motion for Judgment on the Administrative Record;

   c. The Court will treat the Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction and Defendant's Cross Motion for Judgment on the Administrative Record as a Cross Motion for Judgment on the Administrative Record and an Opposition to Plaintiff's Motion for Judgment on the Administrative Record.

   d. The plaintiff shall file its Opposition to the Defendant's and Intervenor's Cross Motions for Judgment on the Administrative Record by October 8, 2014.

   e. The government and the intervenor shall file their Replies to the plaintiff's opposition by October 14, 2014.

   f. Oral argument shall be held on the cross motions on October 17th at 10AM. The courtroom shall be noted on the court calendar posted on the directory in the first floor lobby.

Pursuant to the Court's September 19, 2014 Protective Order, this Opinion and Order has been issued under seal. The parties shall have two weeks to propose redactions and, accordingly, shall file such proposed redactions by October 17, 2014. To aid the Court's evaluation of the proposed redactions and in light of the "presumption of public access to judicial records," Baystate Techs., Inc. v. Bowers, 283 Fed. App'x 808, 810 (Fed. Cir. 2008), the parties shall file a memorandum explaining why redactions are necessary for each item of information for which a redaction is proposed.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge